F. D. RICHARDSON, Appellant, v. UNION MORTGAGE COMPANY et al., Appellees; FIRST NATIONAL BANK OF PERRY et al., Appellants.

No. 39864.

DECEMBER 13, 1929.

REHEARING DENIED APRIL 16, 1930.

*Kelly, Shuttleworth & McManus,* for plaintiff and interveners, appellants.

*D. D. Needham* and *Ben J. Gibson,* for Union Mortgage Company, appellee.

*Nourse & Nourse,* for Central State Bank, appellee.

KINDIG, J.—F. D. Richardson, the plaintiff-appellant, brought this action against the Union Mortgage Company and the Central State Bank, defendants and appellees, to recover

from them, respectively, the amount due on certain bonds, and damages for a breach of trust. Mrs. C. L. Mainland, O. B. Bever, Mrs. Luella C. Curtiss, Mrs. William Fengeld, and the First National Bank of Perry, appeared in said cause as interveners, and as such, joined with the plaintiff, and asked similar relief. A historical review of the preliminary facts at this place will elucidate.

The Union Mortgage Company, appellee, is an Iowa corporation, formerly doing business at Des Moines. It was organized during 1917 or 1918. Thereafter, this concern engaged in making farm loans and selling its own stock until the year 1923. Sometime prior to the commencement of the present suit, October 21, 1927, the company became insolvent, and its property not pledged was sold on general execution. At the time of the trial, there were no remaining assets. While, however, that institution was a going concern, it executed a trust deed, September 15, 1921, for the purpose of securing certain bonds involved in this litigation. Therein the defendant-appellee Central State Bank was named trustee. This appellee is an Iowa banking corporation, transacting business at Des Moines. A bond issue of $250,000 was authorized, but the total amount actually issued thereunder was only $94,300. Of these the plaintiff-appellant and interveners-appellants own the par amount of $39,000. Those bonds thus owned are allocated as follows: First National Bank of Perry, $32,200; Mrs. L. C. Mainland, $2,000; F. D. Richardson, $2,000; O. B. Bever, $1,200; Mrs. Luella C. Curtiss, $1,000; Mrs. William Fengeld, $600.

According to the trust agreement, the bonds were issued by the trustor aforesaid ''for lawful business purposes.'' To secure the principal and interest thereof, the trustor, according to said indenture, agreed to ''grant, bargain, sell, alien, assign, convey, transfer and set over unto the said trustee [appellee Central State Bank], first and second mortgages on Iowa farms and real estate in the manner following, to wit: The company [trustor, Union Mortgage Company] shall so deliver said mortgages into the hands of the trustee [Central State Bank] at such times and under such circumstances that the amount of mortgages in the possession of the trustee under this agreement shall at all times be 100 per cent in excess of the amount of all such

bonds outstanding.'' In compliance therewith, the trustor did deliver to the trustee certain second mortgages, as above contemplated. Complaint is made by the appellant bondholders, however, that, after so doing, the trustee knowingly, fraudulently, and in a grossly negligent manner released certain of said collateral securities to the trustor, and wrongfully accepted from it inferior and worthless substitutions. Such manipulation of securities, appellants contend, amounted to a breach of the trust, which caused great and serious damage to the bondholders. For this loss the present proceeding was instituted and intervention made.

Further explaining how the trustee failed in its duties, appellants urge that the bonds thus withdrawn by the trustor were valuable, and when removed from the trustee, the same were sold, and the proceeds thereof used for the benefit of the trustee, Mr. Schee, and other persons. Schee, who was president of the trustor corporation, it seems, at one time, owned bonds in the par value of approximately $34,700. So, when the mortgaged collateral securities were wrongfully taken from the trustee, as before mentioned, part of them were sold or traded by the trustor to Schee; but the proceeds thus received from him were not replaced in the trust. They were used for other purposes. Some of these securities were transferred, directly or indirectly, to Schee, who, in consideration thereof, returned the bonds held by him to the trustee for cancellation. Thus Schee obtained a preference over other bondholders. During the same time, the trustor was a debtor of the trustee, and to secure such obligation had certain collaterals pledged with the latter. Appellants insist that at least part of the security mortgages wrongfully taken from the trustee were used to pay a portion of the trustor's debts due that creditor. How much of the trustor's obligation to the trustee was thus discharged, the record does not show, and we are left to rely upon mere inference in reference thereto.

Appellees, in answer to appellants' claim, maintain that all substitutions of trust securities were properly made, in accordance with the trust indenture. Continuing, the appellees

assert that at all times the par value of the securities held exceeded the par value of the bonds to the extent of at least 100 per cent. Authority for all withdrawals, appellees say, can be found in Paragraph 3 of the trust indenture, which reads:

"If the company shall well and truly pay to the owners thereof, the principal of bonds secured hereunder, and the interest moneys becoming due thereon, respectively, at the time and in the manner specified in the said bonds and coupons thereto annexed, and shall keep and perform all the covenants, agreements, and stipulations on its part in said bonds and in this agreement contained, then these presents and the trust hereby created shall cease and determine, and the said trustee shall in such event release and discharge this agreement and surrender and assign to the company the mortgages hereby affected, by this agreement. The trustee may also execute such release and discharge and surrender and assign such mortgages, upon production by the company or its assigns of all the bonds issued hereunder, together with the coupons thereto belonging, canceled or for cancellation and the trustee shall not be under any liability or obligation to inquire into the holding of said bonds by the company or its assigns.

"If, at any time, the amount of mortgages held by the trustee under this agreement, shall be more than 100 per cent in excess of the amount of bonds outstanding, the trustee shall, upon request of the company, surrender and assign any mortgages which may be requested by the company, provided that such surrender and assignment shall leave with the trustee, mortgages 100 per cent in excess of the amount of the bonds outstanding."

Every security removed as aforesaid, appellees maintain, was permitted by the trustee because the amount thereof exceeded the bonds outstanding more than 100 per cent. No removal, appellees steadfastly assert, lowered the existing security below an excess of 100 per cent over the outstanding bonds. Consequently, appellees argue, the final sentence of the paragraph above quoted affords the trustee ample protection.

On the other hand, appellants reply that the excess of

securities over the amount required by the trust indenture was created by the trustor and the trustee for the express purpose of making it possible to substitute securities.

I. With appellants' proposition we are inclined to agree. Manifestly, it was a studied scheme entered into between the trustor and the trustee to so arrange the securities that there would appear to be a surplus, and when that apparent excess occurred, the more valuable securities were exchanged for those of lesser worth. For instance, a security of lower value would be placed with the trustee by the trustor on a certain date, and then, the following day, a more valuable security was removed, because a surplus was thus made to appear. Obviously, excessive securities did not exist, as contemplated by the trust deed, but rather an illegal plan to wrongfully effect withdrawals was adopted by the trustor and trustee, whereby that which in fact did not exist appeared, through the scheme, to be a reality. Time after time this practice was repeated. Underlying these manipulations was the intent on the part of the trustor and trustee to make substitutions of collaterals when, in fact, no authority therefor existed under the trust indenture. Certainly the paragraph before quoted does not support a proceeding of that kind.

Paragraph 3, just referred to, must be read in connection with other paragraphs of the trust indenture, and especially Paragraphs 4 and 10 thereof, which are as follows:

"Fourth. The said company, during the life of this agreement and provided there shall be no existing default in respect of the payment of the principal or interest, in any of the said bonds of the company, or in the performance of any of the covenants herein, may sell or exchange any of the mortgages herein affected, if, in the opinion of the board of directors of the company such sale or exchange shall be expedient; said opinion shall be expressed in a resolution of the said board and the trustee may upon delivery to him, of a copy of the resolution of the board of directors, to that effect, release from the lien and operation of this agreement, any of the mortgages hereby affected, provided that the purchase money in case of sale shall be paid to the said trustee for application to the discharge of the bonds and coupons issued hereunder as set forth in Section 10; or provided that such purchase money be set aside to be applied by the company in payment for other property and un-

til so applied, shall be held by the trustee. Any new property so acquired by the company shall *ipso facto* become and be subject to the lien of this agreement as fully as if pledged hereby, but if requested by the trustee, the company shall assign such property to the trustee. All the provisions of this paragraph which are applicable in the case of newly acquired property as hereinbefore mentioned, shall be applicable in the case of the exchange of any of the mortgages hereinbefore referred to for other property. * * *

"Tenth. The company further covenants and agrees, with the parties hereto and with any future holders of bonds that the said bonds are redeemable, at the option of the party of the first part, on any interest-paying date after .................... 1, 1926, at 105 per cent of the face value, plus accrued interest.

"Whenever it is decided to redeem any of said bonds, the board of directors of the company shall pass a resolution, setting forth the amount of bond to be redeemed. The president of the company shall thereupon draw by lot of the numbers of the bonds to be redeemed and he shall thereupon certify that such bonds were drawn for redemption which certificate shall be entered on the minutes of the company and duplicate copy shall be delivered to the trustee. Said bonds having been so drawn for redemption shall become due and payable on the succeeding interest-payment date and the said bonds shall from such interest-payment date cease to draw interest and the said company may upon the deposit of the proper amount with the trustee, be privileged to consider said bonds as paid and canceled."

Substitution of securities was not authorized by the trust deed, either expressly or by inference, and the deed itself must settle that question. *Walker v. Howell*, 209 Iowa 823.

Division 3, aforesaid, provided a method to release securities from the trust in the event some or all of the bonds were paid. Provision was made in the trust indenture for the release of securities in case the bonds were totally or partially satisfied. Previous sentences in Division 3 arrange for total release of securities in the event all bonds are discharged; while the final paragraph, relied upon by appellees, clearly contemplates a partial release of securities to correspond with a partial payment of bonds. That must be so when Divisions 3, 4, and

10 are read together. Were this not true, Division 4 would become entirely inoperative and meaningless.

In each instance of substitution above explained, the securities removed from the trustee were traded or sold. Hence, under the plain provisions of Division 4, the proceeds thereof or receipts therefrom should have been delivered to the trustee, in lieu of the former security. This was not done in the case at bar. Apparently no security was removed from the trustee until it was known by the trustor that there was a market therefor. Regarding this, Mr. Needham, secretary of the trustor, testified:

"In making withdrawals from the Central State Bank, trustee, we withdrew those securities that we could sell or trade; we withdrew them because we had a chance to deal them or do something with them."

By so doing, the protection afforded the bondholders under Division 4 was entirely overcome and made inoperative. All sales and trades contemplated by Division 4 were to be for the reduction of bonds, as provided in Section 10 above quoted; or, if new property was to be purchased, it in turn *ipso facto* became subject to the lien of the bonds. Shrewd methods of circumvention cannot be sufficient to avoid this trust deed provision. Otherwise there is no safety or security for this bond issue. Without such safety and security, trusts of this kind must fail. *Colorado & S. R. Co. v. Blair*, 214 N. Y. 497 (108 N. E. 840), aptly declares:

"Bondholders invest their money on the faith of the pledged security, and unless the mortgage or trust deed authorizes a change or substitution, they have a right to rely upon that particular security."

*Walker v. Howell*, supra. See, also, *Conover v. Guarantee Trust Co.*, 88 N. J. Eq. 450 (102 Atl. 844).

Confidence in business transactions is essential. Lack thereof will cause inactivity and stagnation. Trustees must be reliable and trustworthy. If they are not, beneficiaries of the trust have no protection. With protection absent, there is no need for a trustee. Loss is quite likely to result when the plain provisions of the trust deed are disregarded, as they were in

the instant case. Evidently, under the policy pursued in the case at bar, the trust was executed for the benefit of the trustor, rather than the bondholders. For this breach of duty in wrongfully permitting said substitutions, the trustee is liable.

II. Compliance with the trust requirements was not made by the trustee merely because it kept securities of 100 per cent par value above the outstanding bonds. Each bondholder was  entitled to have the original securities, the cash proceeds thereof, or new property acquired thereby, maintained at all times for the protection of these bonds. Fundamentally, this was the very purpose of the trust. There was no other agreement for the protection of the bondholders. Resultantly, when the trust securities were wrongfully taken from the trustee and inferior mortgages substituted therefor, a breach of trust arose. Mere equality of par values in the various securities did not satisfy this requirement. Actual, and not par, value was the bondholders' protection afforded by the trust deed. Therefore, the trustee is liable to the bondholders for the breach of trust, unless it is shown that the new security was just as valuable as the old. Under the evidence, the substituted or replaced securities were of inferior value, and at the time this case was tried, they were worthless. Whether they ever had any value is not disclosed. The burden of proof at this juncture was clearly upon the trustee, in view of the fact that it breached the trust: that is to say, if the trustee is to avoid liability on the theory that the substituted securities were as valuable as the original, it must prove the fact, because there was no authority in the trust deed for the exchange. Consideration has been made of appellees' amended abstract of record, but a careful reading thereof makes clear that the required proof was not furnished.

Affirmative showing, however, is made by the appellant bondholders to the effect that the substitutions were inferior and worthless, while the original securities wrongfully withdrawn were valuable. Approximately $83,953.55 in cash or valuable property was received by the trustor for the securities withdrawn from the trustee. This is fairly shown by the record. When arriving at this amount, no account is made of $7,657.01 interest collected by the trustor from securities in the possession of the trustee. In other words, the trustee failed to collect

interest on the mortgages held as security by it. As previously stated, the total amount of bonds purported to have been issued was $94,300. Of that amount, bonds in the par value of $44,000 were previously retired. Thus there are now outstanding bonds in the par value of $50,300. Appellants, as before said, hold of these, $39,000 in par value. Consequently, there are $11,300 of the outstanding bonds in par value not represented in this suit.

Were the Schee bonds wrongfully redeemed and the other outstanding bonds all in this suit, there would still be security enough (except for the wrongful withdrawals) to protect them all, according to the record; for the bonds issued to the Farmers & Merchants State Bank in the amount of $10,500, in fact, represented no issue, because the transaction there involved was never consummated. Hence, the amount of bonds actually and finally issued was not $94,300, but $10,500 less, or $83,800. Wherefore, when $83,800, representing the amount of the bonds actually outstanding, is deducted from the total value of the withdrawn securities, which was $83,953.55, there is still a margin remaining. Assuming, without deciding, that appellants could recover, in no event, more than their proportionate share of the bonds actually issued, the record, nevertheless, as before indicated, supports a judgment in their favor in the amount of the bonds actually held by them, because the securities wrongfully released exceed the total sum of all bonds actually issued. Interest thereon should be allowed from the time of the due date thereof.

Judgment and decree should be entered accordingly, unless appellee-trustee has absolved itself from responsibility through one or more of the matters hereinafter discussed.

III. First, appellees predicate a defense upon the method and way in which the First National Bank of Perry and its assignees, the appellants herein, obtained the bonds in suit.  These bonds, it seems, were first sold to the First National Bank of Perry under the following circumstances: Harry and W. H. Pattee were stockholders of both the trustor and said First National Bank. Those brothers owned a hotel at Perry, which they sold or traded. The purchaser thereof, in order to close the transaction,

desired to secure a loan of $30,000 or $40,000. Being anxious to complete the deal, the Pattee brothers caused the First National Bank, of which they were officers, to buy certain notes from the trustor, in consideration for the latter's loaning said purchaser the money aforesaid. Accordingly, the loan was made, and notes purchased. Later, the First National Bank found the notes objectionable to the national banking department, and therefore exchanged those instruments for the bonds involved in this suit. Afterwards, part of the bonds were sold to the other appellants.

It is said by appellees that the cashier of the First National Bank went to Des Moines for the purpose of interviewing, and did there interview, the trustee's trust officer concerning the securities held as a protection to the bonds. At this place Mr. Hasbrouck, the trust officer, testified:

"Mr. Grimes [the cashier of said First National Bank], of Perry, came to see me. From the questions he asked, primarily, I think, to ascertain the quality and nature of the securities we had, and that was gone into very thoroughly. That is, these second mortgages and first mortgages,—asking questions if they were second, and our opinion of them, and that nature. As I recall, I says: 'I will let you answer your own questions. How do you regard second mortgages on Iowa farms at this time?' "

Clearly, however, Mr. Grimes, the cashier of the Perry bank, did not, because thereof, know, inquire into, or learn anything about the trustee's method in substituting securities, nor is there any intimation in the record that this representative of the Perry bank understood that good securities were being exchanged for inferior or worthless ones. Notice, then, concerning the trustee's practice of making these substitutions was not given either to the Perry bank or the other appellants at the time the bonds were purchased.

IV. Second, it is maintained by the appellees that, because of exceptions contained in the trust deed, freeing the trustee from liability, the judgment and decree above specified should

 not be entered. Such exceptions, however, do not apply to the facts upon which the cause of action is here based. Attempt is not made here to hold the trustee for false certifications, failure of judgment, wrongful exercise of discretion, or the omission of the trustor to furnish valuable securities in the first instance under the trust deed. Foundation for liability is here laid upon the unauthorized and wrongful substitutions of securities which were willfully and, through the circumstances, fraudulently permitted by the trustee. Plainly, then, the exemptions above referred to have no place here.

V. Third, the argument is advanced by appellee that, in allowing the substitutions, it merely exercised its judgment, and if mistake was made, there can be no liability therefor. Under certain circumstances and conditions, a trustee may not be responsible for mere error in judgment. Before that principle can be applied, however, there must be present a subject-matter upon which the trustee's judgment can be exercised. Without that premise, the appellee trustee's conclusion cannot be reached. Here, the trust deed did not permit substitutions. Therefore, the trustee could not, in the exercise of its judgment, allow such replacements; for, if substitutions were not authorized under the trust deed, the trustee's judgment could not supply what that instrument lacked in this regard. Speaking generally upon this subject, the court, in *Conover v. Guarantee Trust Co.*, 88 N. J. Eq. 450, 457 (102 Atl. 844, on page 847), said:

"The distinction between a case in which a trustee has transcended the powers conferred by the trust, and one relating to matters of judgment or conduct on the part of a trustee in transactions within the trustee's powers, necessarily enters into all considerations touching a trustee's liability. For the former, there appears to be no justification; for the latter, there may be."

Presented in the case before us is a trust deed which does not authorize substitutions; and when the trustee, regardless thereof, made replacements, it transcended the powers conferred. Judgment, then, had no basis upon which to operate. Had the power of substitution been granted in the deed, judgment in executing that part of the trust might have been exercised. There

being no place for the exercise of judgment, this defense has no application.

VI.   Fourth, the appellee trustee maintains that the execution of this trust was made by an honest and experienced employee, who was "selected with reasonable care," and therefore there is no liability on the trustee for the substitutions made by him.   Basis for this contention is found in an exception contained within the trust deed, reading as follows:

"The trustee shall be answerable only for its own acts, receipts, and defaults, and not for those of any person employed by it and selected with reasonable care."

Carried to its logical conclusion, said appellee's argument here would mean that it may be a trustee, draw pay therefor, and yet have no responsibilities, if, perchance, employees have been hired to execute the trust.   Who is the trustee?   Certainly not the employee.   This trustee is a corporation, and as such, it must act through agents and representatives.   Nevertheless, the act of the agent or representative in the instant case is that of the corporation.   Everything done here in reference to the substitutions related to a fundamental element in the trust. Surely, the trustee was something more than an employment agency.   Doubtless, appellee was in fact a trustee, with duties as imposed by the trust deed.   Within the purview of that instrument, the original securities delivered by the trustor were to be retained for the security of the bonds, unless released by the express methods previously discussed.   Appellee does not claim that its trust officer was not representing it, or acted in any way without authority.   Whether, in any event, the trustee could make such assertion, we do not now decide.   If the trust officer aforesaid had misappropriated any of the funds or in any way stepped from the path of his duties, and represented himself, as distinguished from his employer, a different situation would arise.   What the case would be in such event, we do not now determine; for it is sufficient to say that, under the facts and circumstances of this record, the acts of the employee were those of the employer.

Accordingly, the appellants are entitled to a judgment and decree, as previously indicated, and the judgment and decree of the district court must be, and hereby is, reversed.—*Reversed.*

All the justices concur, except STEVENS and DE GRAFF, JJ., who take no part.